## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2018, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of G.M.:

K.C. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 28, 2018

Court of Appeals Case No.
35A04-1709-JT-2088

Appeal from the Huntington Circuit Court

The Honorable Thomas M. Hakes, Judge

Trial Court Cause No.
35C01-1705-JT-6

**Pyle, Judge.**

# Statement of the Case

K.C. ("Father") appeals the termination of the parent-child relationship with his son, G.M., arguing that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in G.M.'s removal or the reasons for placement outside the home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to G.M.'s well-being; and (3) termination of the parent-child relationship is in G.M.'s best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm.[1]

We affirm.

# Issue

Whether there is sufficient evident to support the termination of the parent-child relationship.

# Facts

G.M. was born in December 2014 with a congenital heart defect. He was also suffering from opiate withdrawal. He was immediately placed in a neonatal intensive care unit, and DCS removed him from his parents under an emergency order because M.M. ("Mother") admitted using unprescribed pain

---

[1] Mother's parental rights were terminated in a prior order.

killers and heroin during her pregnancy and because Father refused to take a drug screen. Father stated that he was unable to "care for the child as he [was] on probation for rape and [was] not permitted to be around children unsupervised." (DCS Exhibit P). A few days later, DCS filed a petition alleging that G.M. was a child in need of services ("CHINS") based on Mother's drug use, Father's inability to care for G.M. and refusal to take a drug screen, and G.M.'s drug withdrawal.[2]

[4] Later that month, Father agreed to take a drug screen, and his urine tested positive for oxycodone. Three days later, Father's urine tested positive for morphine, and he admitted that he had used heroin. After testing positive for opiates, Father began participating in a drug treatment program. However, he was subsequently discharged from the program because of inconsistent attendance. In May 2015, the trial court revoked Father's probation because of his positive drug tests and ordered him to serve the remainder of his suspended sentence for rape and burglary.

[5] G.M. was adjudicated to be a CHINS in September 2015. The trial court ordered Mother to participate in services, attend visitation, and submit to random urine drug screens. The court's order further stated that Father could participate in services as he was able while incarcerated.

---

[2] G.M. was placed in foster care when he was discharged from the hospital in January 2015.

[6]     In March 2016, DCS filed a petition to terminate both parents' parental rights. The trial court granted the petition in August 2016. Both parents appealed. This Court affirmed the trial court's termination of Mother's parental rights but reversed the termination of Father's parental rights because G.M. had not been removed from Father under a dispositional decree for at least six months as required by INDIANA CODE § 31-35-2-4. *Matter of G.M.*, 71 N.E.3d 898, 909 (Ind. Ct. App. 2017).

[7]     In May 2017, DCS filed a second petition to terminate Father's parental rights. At the termination hearing, DCS Family Case Manager John Lane ("Case Manager Lane") testified that Father had only seen G.M. a few times following G.M.'s birth. According to Case Manager Lane, Father could have had more visits with G.M. had Father agreed to submit to drug screens. After he was incarcerated, Father made no effort to communicate with G.M. or DCS until the second petition to terminate his parental rights had been filed. Case Manager Lane further testified that two and one-half year-old G.M. was bonded to his foster parents, who had been able to care for his special needs. According to Case Manager Lane, termination was in G.M.'s best interests.

[8]     Department of Correction Case Worker Regan Dietz ("Case Worker Dietz") testified that Father was not eligible to participate in any prison services at that time because of his poor conduct. According to Case Worker Dietz, in the previous year, Father had received several conduct reports for possession or destruction of state property, disorderly conduct, fleeing or interfering with staff, and refusing to obey an order. Father's earliest release date at the time of

the hearing was July 2019. However, Case Worker Dietz testified that because Father had completed his college education while incarcerated, she had recommended him for a job that would reduce his sentence by six months.

[9] The testimony further revealed that G.M. had been hospitalized five times and had had three surgeries, including open heart surgery. According to the guardian ad litem ("GAL"), G.M.'s foster parents had provided care for his special medical needs, and G.M. was "thriving in the foster home." (Tr. 83). The GAL further opined that termination was in G.M.'s best interest because it was "in his best interest to make permanent what . . . he knows his life to be at this point." (Tr. 84-85).

[10] Father testified that he did not "want to fall back into the same old lifestyle and use drugs again . . . ." (Tr. 99). When asked at the hearing what his "goal [was] here today," Father responded, "I just want to keep my parental rights, you know, I don't want to lose the rights to him." (Tr. 99). Father did not mention whether he had either thought about or secured employment or housing in anticipation of his release or how he planned to care for G.M.

[11] Following the hearing, the trial court issued an order terminating Father's parental rights. Father now appeals.

## Decision

[12] Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their

children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[14] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[15] Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in G.M.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to G.M.'s well-being.

[16] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in G.M.'s removal or the reasons for placement outside the parent's home will not be remedied.

[17] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

[18] Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[19] Here, our review of the evidence reveals that G.M. was removed from Father because of Father's inability to care for G.M. and refusal to submit to drug screens. For more than two years, Father, who knew that his son had been born with a congenital heart defect, made no effort to communicate with G.M.

or DSC. Recently, Father had been unable to participate in any prison programs because of his conduct, which included possession or destruction of state property, disorderly conduct, fleeing or interfering with staff, and refusing to obey an order. During his testimony, Father did not mention whether he had thought about or secured employment or housing in anticipation of his release or how he planned to care for G.M. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in G.M.'s removal or continued placement outside the home would not be remedied. We find no error.[3]

[20] Father also argues that there is insufficient evidence that the termination was in G.M.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parent to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical,

---

[3] We note that Father has cited several cases wherein both this Court and the Indiana Supreme Court have reversed the termination of parental rights where, as here, the parent was incarcerated. However, in those cases, the incarcerated parent had done things such as remaining in contact with the child, making substantial or remarkable self-improvement efforts while incarcerated, securing housing or employment in anticipation of release, and taking steps to provide permanency for the child upon release. Here, Father has done none of these things. The trial court did not err.

mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[21] Here, our review of the evidence reveals that Father made no effort to communicate with G.M. or DCS until DCS filed a second petition to terminate his parental rights. Meanwhile, G.M. is thriving in a stable and nurturing foster home with foster parents who have consistently provided for his special medical needs. In addition, both the DCS caseworker and the GAL both testified that termination is in G.M.'s best interests. This evidence supports the trial court's conclusion that termination is in G.M.'s best interests.

[22] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[23] Affirmed.

Kirsch, J., and Bailey, J., concur.